■ In the Matter of Emily Gross, as Trustee under the Last Will of Martin Escher, Deceased. New York State Department of Mental Hygiene et al., Appellants; Benedict Ginsberg, as Guardian ad Litem, et al., Respondents.—Decree, Surrogate's Court, Bronx County, entered on January 5, 1979, affirmed, without costs and without disbursements, on the opinion of Gelfand, S., at Surrogate's Court. Concur—Ross, J. P., Markewich, Lynch and Carro, JJ.

Bloom, J., dissents in a memorandum as follows: On this application to settle the intermediate account of the successor trustee, the Commissioner of Mental Hygiene appeals from so much of the decree as dismissed the claim of the Director of Rockland Psychiatric Center for payment of the sum of $82,910.36 from the corpus of the trust created for the benefit of

Marie Escher (Marie). This claim is substantially in excess of the principal of the trust. On December 8, 1924 Martin Escher (Martin), the testator herein, executed his last will and testament. He was the father of five children, one of whom, Marie, had suffered from epileptic convulsions since the age of one. By his will Martin, after making certain minor specific bequests, directed that his residuary estate be divided into as many shares as he had children, living or deceased, and to distribute one such share to each child, with the exception of Marie, *per stirpes and not per capita.* With respect to Marie he directed that her share be held in trust until she reached the age of 30. John Escher (John) and Emily Gross (Emily), both children of Martin and a brother and sister of Marie, were named as trustees. On February 12, 1932, somewhat more than seven years later, Martin executed a codicil to his will. He altered his testamentary scheme in two salient respects; first, the family residence located at 310 East 157th Street, Bronx, in which Martin and Marie resided, and all the furniture and household effects contained therein, was devised to Emily. Secondly, the trust created for Marie was revoked and a new trust created "for and during her natural life". The income therefrom was to be distributed to her quarter annually and the trustees were empowered "to pay out of the principal of said trust such sum or sums as may be necessary to provide for the payment of any and all expenses necessary for the maintenance or support of my said daughter Marie Escher by reason of any illness, accident or other emergency". Any balance remaining in the trust at the time of her death was to be paid over to her distributees, *per stirpes and not per capita.* Martin died on February 26, 1937. Letters of trusteeship were issued to John and Emily on April 18, 1950. In 1956 Marie was adjudicated an incompetent and Edward Escher, another brother, was appointed committee of her person and property. He continued to act in that capacity until his discharge on May 24, 1972. The balance remaining in his hands was turned over to the Department of Mental Hygiene as a luxury and burial fund. The order of discharge directed the trustee to pay all future income of the trust directly to the Director of the Rockland Psychiatric Center to defray the cost of past and future charges. John died in September, 1968. Thereafter, and until her death on July 15, 1978, Emily continued to act as sole surviving trustee. By order entered October 27, 1978 Barbara Glass (Emily's daughter) was designated a successor trustee. Marie became a patient at Rockland State Hospital (Psychiatric Center) in January, 1947, some 10 years after the death of Martin and some nine and one-half prior to her adjudication. During the 30-year period ending October 21, 1977, that Marie had been a patient at Rockland, somewhat in excess of $22,500 had been paid over to its director for her care and maintenance by Edward as committee and Emily as trustee. All of this represented income of the trust. No part of the corpus has been invaded. When this proceeding to settle the final account of Emily, as trustee, was brought, a claim was interposed by the Department of Mental Hygiene on behalf of the Director of the Rockland Psychiatric Center seeking reimbursement from the trustee for the balance due for the maintenance and care of Marie. When the trustee refused to exercise her discretion to invade the corpus of the trust, the issue was submitted to the Surrogate upon an agreed statement of facts. He concluded *(Matter of Escher,* 94 Misc 2d 952) that EPTL 7-1.6 (subd [a]) was not applicable inasmuch as the remaindermen, a nephew and two nieces of Marie (including the trustee), refused to consent thereto and that the emergence of public assistance into a right protected by law negated any intent on the part of the testator to utilize the trust corpus to pay for that

freely given by the State to the indigent. We are in agreement that the commissioner may derive no comfort from EPTL 7-1.6 (subd [a]). Since the remaindermen, although adult and competent, have refused to accede to invasion of the corpus, relief, if relief is to be had, must flow from the instruments themselves. The intent of the testator, as reflected in the will and codicil, and the context in which those instruments were drawn, must govern *(Matter of Upjohn,* 304 NY 366; *Matter of Clark,* 280 NY 155; *Matter of Nicol,* 24 AD2d 191; *Matter of Day,* 10 AD2d 220). " 'The judicial interpretative function is to find the meaning of the testator as expressed in the language used, considered in the light of the attendant circumstances, and effectuate it.' " *(Matter of Nicol,* 24 AD2d 191, 197, *supra).* The meaning, however, must be determined by reference to the circumstances existent at the time that the words were used. It is not to be ascertained by the fiction of relating the language used to some set of circumstances which came into being long after the death of the testator. We are not free to base intent on speculation of what the testator would have done were he executing his will today. "It is the intention which exists at the time of execution which controls, not one thereafter formulated and not expressed in the instrument" *(Matter of Nicol,* 24 AD2d 191, 197, *supra).* To hold otherwise would be to make intent an ambulatory concept, subjecting the same document to differing interpretations dependent upon prevailing social mores and economic conditions. That Marie was of primary concern to the testator is evidenced by the 1932 codicil. The two changes thereby made in the original will both affected her most intimately. The first was a devise to Emily of the house which, to Marie, was home. The second was to revoke the trust which was to terminate when she reached the age of 30, a time already past, and to create a trust which would endure throughout her life. It is not difficult to piece the two threads together. Implicit was the testator's understanding that Marie would live out the balance of her life in the family residence. Moreover, to each of his other children he gave an equal share of his estate. The share accorded to Marie was placed in trust only because of her debility. Save for that she, too, would have received her share of the patrimony outright. Finally, and most compelling, was his direction that the corpus was to be reached where necessary for the support and maintenance of Marie by reason of any illness, accident or other emergency. These elements, taken together, bespeak a firm intent that so much of the trust *res* as was necessary to provide care for Marie was to be used for that purpose. *Matter of Damon* (71 AD2d 916), relied on by the trustee, is not to the contrary. There, the testator created a testamentary trust for the benefit of his incompetent daughter who, at the time of the admission of his will to probate was a patient at Pilgrim State Psychiatric Center. The will authorized the trustee to invade the principal of the trust "in the event of critical illness, operation or need for operation or other emergency". The trustee, as here, was a remainderman, and refused to exercise her power to invade for the purpose of paying the bills due to Pilgrim. Citing the decision of the Surrogate in this case, the court held that no emergency existed which justified compelling the trustee to invade the principal of the trust. *Damon* differs from this case in one salient respect. There the "critical illness" which necessitated the hospitalization of the life tenant had occurred *prior* to the death of the testator. Hence, it was held not to be the kind of "other emergency" contemplated by the testator. Here, however, Marie did not become a patient at Rockland until almost 10 years *after* the death of the testator. That Martin never contemplated that Marie would be permanently hospitalized is evidenced from the second change in

his will effected by the codicil; the devise of the family residence to Emily. Accordingly, it falls within the purview "of maintenance and support * * * by reason of any illness, accident or other emergency" and constitutes a suitable predicate for invasion of the trust *res.* Section 43.03 of the Mental Hygiene Law, although not here applicable, is significant for its enunciation of the philosophical basis for the requirement of payment. In pertinent part it provides: "The patient, his estate, his spouse, his parents or legal guardian if he is under twenty-one years of age, and his committee and any fiduciary or representative payee holding assets for him or on his behalf are jointly and severally liable for the fees for services rendered to the patient". Underlying this provision is the concept that no one who can afford to pay for the services rendered to him ought escape payment *(Matter of Osadchey,* 53 AD2d 960). Here, the testator made available funds which ought be used for the purpose of providing for the care and maintenance of Marie. In failing to utilize those funds for the purposes specified by the testator the trustee abused her discretion (cf. *Matter of Rath,* 58 Misc 2d 184). There remains a question raised by Marie's guardian ad litem. He argues that so long as she remains alive some emergency may arise which may necessitate utilization of the trust corpus. In part, at least, he is correct. Accordingly, I would reverse the decree appealed from to the extent of remanding the issue to the Surrogate with instructions to determine the degree to which the principal of the trust may safely be invaded now, in accordance with the intent of the testator, reserving until after Marie's death, the turnover of the balance of the trust. [94 Misc 2d 952.]